Cary W. BOK, for himself as a shareholder of Curtis Publishing Company and on Behalf of all other shareholders of Curtis Publishing Company

v.

Martin S. ACKERMAN, Perfect Film & Chemical Corp., E. Eugene Mason, Milton S. Gould, Downe Communications, Inc., the Saturday Evening Post Co., G. B. McCombs & Curtis Publishing Co.

The CURTIS PUBLISHING CO.

v.

PERFECT FILM & CHEMICAL CORP.

The CURTIS PUBLISHING CO.

v.

Cary W. BOK et al.

Nos. 69–305, 69–817, 69–979.

United States District Court, E. D. Pennsylvania.

Feb. 26, 1970.

Morgan Lewis & Bockius, by Ernest R. von Starck, John H. Lewis, Jr., and Gregory M. Harvey, Philadelphia, Pa., for Cary W. Bok.

Philip P. Kalodner, Philadelphia, Pa., for intervenor plaintiff.

Lewis H. Van Dusen, Jr., and Raymond Denworth, Philadelphia, Pa., for Martin S. Ackerman, E. Eugene Mason Milton S. Gould & G. B. McCombs.

Harold E. Kohn of Dilworth, Paxson, Kalish, Kohn & Levy, Philadelphia, Pa., for Perfect Film & Chemical.

Arthur H. Kahn, Philadelphia, Pa., for Downe Communications, Inc.

John G. Harkins, Jr., Stanley R. Wolfe, and John J. Runzer, Philadelphia, Pa., for Curtis Pub. Co.

Wolf, Popper, Ross, Wolf & Jones, by Howard L. Jacobs, New York City, Ostroff & Lawler, Philadelphia, Pa., for objector, Miriam Wolf.

## MEMORANDUM ORDER

HIGGINBOTHAM, District Judge.

### I.

### THE SUITS AND ATTEMPTED SETTLEMENT

When those who manage the affairs of massive corporations have a falling

out there very often follows massive and protracted litigation. So it was in Bok v. Ackerman, C.A. 69–305, and the related above-captioned civil actions which arose in the wake of dissatisfaction with major corporate dealings between the Curtis Publishing Company (hereinafter referred to as "Curtis"), Perfect Film and Chemical Corporation (hereinafter referred to as "Perfect"), and other companies. Before the Court is a motion by the parties for approval of a compromise settlement which will call a halt to the litigation. Miriam Wolf (the "Objector") opposes this motion and asks the Court to grant a thirty day discovery period for the preparation of factual data to support objections to the settlement.

Begun on February 10, 1969, the consolidated actions have been carried on with most intense advocacy by each party—advocacy which at times almost seemed to rise to zealot proportions. None of the parties seemed willing to make even minor concessions until after their points had been pressed most aggressively, until after voluminous briefs had been filed and often far too lengthy oral arguments had been made. The cases have generated hundreds of opposing docket entries: motions, answers, and briefs. There have been several courtroom hearings and arguments, and numerous conferences in chambers.

The original complaint in Bok v. Ackerman sounded in six counts and sought derivatively to enforce *inter alia* the following claimed rights on behalf of Curtis. Under Counts I, II, and III, the shareholder plaintiff sought on Curtis' behalf *to rescind:* an agreement for the sale of Curtis' circulation and subscription companies to Perfect, the so-called foreclosure agreement, an agreement for the sale of three magazine properties to Downe Communications, Inc., (hereinafter referred to as "Downe"), and agreements by which Curtis was to purchase stock and absorb operating expenses of the Saturday Evening Post Company (hereinafter referred to as "Sepco"). Plaintiff also asked for an accounting for all profits arising from the operation of the transferred companies and assets. Count IV alleged that Curtis had been caused without consideration to transfer surplus assets in the Curtis Pension Plan and Trust to Perfect and sought to undo this transaction. Finally, Count V alleged fraudulent stock transactions in violation of the Securities Exchange Act of 1934, and Count VI called for the appointment of a receiver to take custody of the Curtis accounts and records, to conserve assets, and to conduct a fair election of a new Board of Directors.

On November 26, 1969, the principals to the litigation put their signatures to a twenty-one page agreement designed to resolve all outstanding questions between and among them. By ORDER of December 19, 1969, I set a hearing in open court for January 21, 1970, to give those who might oppose the proposed compromise settlement an opportunity to make known their positions.

II.

OBJECTIONS TO THE SETTLEMENT

One stockholder only, Miriam Wolf, through her counsel came forward to oppose the settlement. Additionally, I received three brief letters and a telegram (see docket entries 91, 92, 93 and 95) which in terms often cryptic and conclusionary express disapproval of segments of the proposed settlement. David Nowak submits a "defense of Cary W. Bok to be used * * * or omitted completely from the suit." Jerome Singer is dissatisfied that though "Curtis is now back in the publishing business," "the nucleus of what could have been used for a good start is in the hands of Perfect." And Victor Kurtz suggests: "Let Perfect Film keep Status Magazine and take this fact into consideration in the Compromise Settlement." Richard Rov's telegram, sent from New York City four days after the January 21, 1970, public hearing, states only that he feels that "the settlement is not in the best interest of the stockholder."

Miriam Wolf filed a statement of objections setting forth the following seven·objections to the proposed settlement:

(1) The terms of the proposed settlement are said to be unfair to Curtis and its stockholders and to unduly favor the defendants and plaintiff, Cary Bok; (2) the settlement· allegedly improperly dismisses claims against Cary Bok in the *Wolf* and *Tait* actions and claims against other defendants in the *Wolf* action without any contributions by them for the benefit of Curtis and its stockholders; (3) the settlement allegedly improperly provides that releases will be given by plaintiffs Wolf and Tait; (4) Cary Bok is accused of agreeing to the settlement, not to benefit Curtis, but to gain him his release as well as releases for his co-trustees and associates; (5) Curtis is alleged not to have been adequately compensated for the sale of Downe stock to Perfect; (6) the provision as to Martin Ackerman's cooperation in prosecuting a suit by Sepco against Frederic Gregg, Jr., is said to be inadequate; and (7) Curtis is alleged to be uncompensated for damages resulting·from Perfect improperly causing Time, Inc., to cease purchasing printing services from Curtis. In an affidavit filed with the Court on January 23, 1970, objector Wolf requested time to conduct discovery, to seek testimony and documentation concerning objections (2), (4), (5), and (7) above.

At the hearing, counsel for Miriam Wolf pressed his claim that the proposed settlement unduly benefitted Cary Bok, as discussed in objections (2), (3), and (4) above. Mr. Jacobs tentatively suggested that a settlement between Curtis and Perfect might well have been worked out without releasing Cary Bok:

"MR. JACOBS: Well, if Curtis wants to settle its claims with Perfect and with Ackerman and the other defendants leaving aside Mr. Bok I am sure that Perfect Film and Chemical—I can't say I am sure, but I would think that Perfect Film and Chemical would have been very happy to settle the case. I don't know the fact that Mr. Bok has to be released from all claims against him was a condition to settling the case for the benefit of Curtis. Maybe this is something that was added on for the benefit of·Mr. Bok and not for the benefit of anybody else involved in the settlement." (N. T., pp. 41 and 42.)

Counsel for Perfect, Harold E. Kohn, stated that "It was I, not the attorneys for Curtis or for Mr. Bok, who asked to have Mr. Bok and all the other directors released as part of this settlement. * * * Perfect wanted to be sure that this litigation was completely, finally and all-inclusively settled. * * * I state as a fact it took several days of negotiations before the Curtis people finally agreed to give that up. It was not their idea." (N.T., p. 45.) Mr. Kohn has filed an affidavit to this effect (docket entry 85), which states, *inter alia:* "I consistently informed counsel for Curtis that Perfect would not enter into any settlement agreement unless Perfect was assured that all litigation * * * would be terminated. To this end, I insisted, on behalf of Perfect, that Curtis must give releases to its former officers and directors. * * * The representatives of Curtis· stated they were unwilling to agree to this request, and Curtis has agreed only after it became clear that *there could be no agreement with Perfect in the absence of such releases.*" (Emphasis added.) Counsel for Perfect then, and not Cary Bok or others, was responsible for that provision of the proposed settlement which released Cary Bok. Indeed, Mr. Kohn's affidavit makes it clear that the release of Cary Bok was a condition precedent to any settlement. And this was because as Mr. Kohn stated at the hearing on·January 21, 1970: "I told them Perfect wanted to be sure that this litigation was completely, finally and all-inclusively settled or we were not interested in a settlement because we didn't want cross-claims from somebody else, to be added as an additional defendant, to have the litigation continue in

such a way that we would still be party to continuing litigation even though we thought the suit was settled." (N.T., p. 45.)

Miriam Wolf's objection that Curtis was not adequately compensated for the sale of Downe stock to Perfect deserves comment. The sworn affidavit of Kenneth B. Artz, Treasurer of Curtis, demonstrates that Curtis did not sell the Downe stock to Perfect. Rather, as the affidavit states, *Perfect* sold the Downe stock "for the account of Curtis" and "Curtis received the full benefit of the proceeds." The affidavit of Philip P. Kalodner, shareholder, director, former chief executive of Curtis, and plaintiff and/or intervenor in several of the related Curtis cases, states his conviction "beyond any reasonable doubt that Curtis did in fact receive approximately the then market value, after deduction for expenses, for the stock of Downe." Kalodner believes that the substance of the allegation here made by Miriam Wolf appears in his earlier complaint in a related action. An examination of the books and records of Curtis has convinced Kalodner that the sale of the Downe stock "was not itself actionable."

Miriam Wolf's allegation about Perfect causing Time, Inc., to cease purchasing printing services from Curtis is likewise contradicted by the affidavits of Artz and Kalodner. The Kalodner affidavit states that Curtis was required to cease providing printing services to Time, Inc., because Curtis could no longer operate its printing facilities at a profit and that the decision to discontinue activities at the printing plant was taken as a matter of business judgment.

### III.

### DILIGENCE AND THE RIGHT TO DISCOVERY.

Is Miriam Wolf entitled to a thirty day discovery period at this point in the proceedings?

At the hearing I stated my understanding of objector's position as follows:

"THE COURT: So, your position is that you are not prepared at this point to put on evidence in opposition to the motion for approval of a compromise settlement, but that you would ask for a period of 30 days in which you would be able to present the evidence to support your allegation."

And again:

"THE COURT: * * * your client who owns 100 shares objects to the approval of the proposed compromise settlement, and * * * you would need 30 days in which to present to me the evidentiary data which you think will support your allegations that the settlement is not in the best interests of the stockholders.

"MR. JACOBS: That's correct, Your Honor, and we have attempted to set forth in our statement *in general terms* the areas that we believe the settlement is unfair without prejudice, of course, to any further areas that we might be able to develop if permitted to hold discovery in the next 30 days." (Emphasis added.) (N.T., pp. 9, 10 and 11).

As I stated at the hearing on January 21, 1970: "There are issues which frankly concern me in terms of diligence [on the part of objector Wolf]." (N.T., p. 38). I asked counsel for Miriam Wolf a series of questions which I here reproduce in part:

"THE COURT: Your suit was commenced February 26, 1969.

"MR. JACOBS: Yes. * * *"

* * * * * *

"THE COURT: And what was the date the stay was entered?

"MR. JACOBS: May 14."

* * * * * *

"THE COURT: Now, what discovery did you take in that three-month period?

"MR. JACOBS: None, Your Honor.

We amended our complaint and joined Mr. Bok. That was served on March 30 I believe.

"THE COURT: And why didn't you take any discovery during this three-month period?

"MR. JACOBS: There is no answer to that, Your Honor. We were investigating the case. We were doing things preparing for discovery." (N. T., pp. 32 and 33.)

At my direction Mr. Jacobs delivered to me a copy of the hourly billing records of his law firm relating to the matters before the Court. It is Mr. Jacobs' affidavit that "we spent a total of 150 hours and 55 minutes on this matter through January 22, 1970. * * * our out-of-pocket disbursements * * * amount to $358.53."

The hourly records reveal that thirty-seven hours—almost one-quarter of the total amount of time expended on these cases—were taken up from February 21 to March 21, 1969 with the preparation of a complaint and amended complaint and with the issuance of summonses. An additional eighteen hours and fifty minutes—an eighth of the total time— were spent on January 21 and 22 of 1970 preparing for and appearing before me and drafting follow-up material for this Court. Five hours and fifty minutes were devoted to reading and studying *Board Room* by Clay Blair. From May 5 to May 16, 1969, nineteen hours and forty-five minutes were devoted to working on the motion for stay in the Southern District of New York. Without belaboring the hourly records any further, I think the point clearly emerges that counsel for Miriam Wolf spent precious little time familiarizing themselves with the litigation before me, settlement of which they now seek to prevent.

Counsel for Miriam Wolf received a copy of the Stipulation of Settlement back on October 10, 1969. Thereafter less than six hours were spent studying the stipulation and preparing objections thereto for two full months. To return to the series of questions which I asked counsel for Miriam Wolf at the hearing on January 21, 1970:

"THE COURT: * * * Have you read through all of the depositions which were taken on this (case)?

"MR. JACOBS: I have not.

"THE COURT: Have you read through any of the depositions that have been taken?

"MR. JACOBS: I have not.

"THE COURT: Have you ordered any of the depositions that have been taken?

"MR. JACOBS: I have not.

"THE COURT: Have you read through the pleadings and all of the documents in the suit of Curtis v. Perfect, 69–817?

"MR. JACOBS: Did you say all of the documents? No.

"THE COURT: What have you read in that?

"MR. JACOBS: Pleadings."

* * * * * *

"THE COURT: Have you read through the pleadings in Curtis v. Sepco in Delaware courts?

"MR. JACOBS: No.

"THE COURT: Have you read through the pleadings in Bok v. Ackerman, and if so, when?

"MR. JACOBS: I recall we have—we received a copy of the complaint, and I studied the complaint in that action.

"THE COURT: Have you done anything beyond that?

"MR. JACOBS: No."

The dialogue continues in a similar manner for two more pages, and concludes in the following way:

"THE COURT: * * * you have not read through one deposition which has ever been taken in any of this litigation?

"MR. JACOBS: That's right.

"THE COURT: And no one in your firm has read through any of the dep-

ositions or ordered any of the depositions that have been taken?

"MR. JACOBS: That's correct, Your Honor." (N.T., pp. 34–39.)

The expenditure of only 150 hours and 55 minutes in an eleven month period, the failure to take any discovery, the failure even to read any of the numerous relevant depositions in Bok v. Ackerman—such inaction by counsel for one lone stockholder does not evidence that diligence of purpose which I would require at the eleventh hour plus to hold up a multimillion dollar settlement, arrived at only after arduous and painful arms-length negotiation. Nor can I be unmindful of the fact that thousands of shareholders have not come forward to contest the fairness and validity of the proposed settlement.

## IV.

## APPROVAL OF THE SETTLEMENT

Although I shall deny objector Wolf the right to initiate new discovery at this late hour, I must still independently evaluate the proposed settlement and decide whether to grant it judicial approval. As Professor Moore has noted "compromise is left to the sound discretion of the trial court." 3B Moore's Federal Practice, Para. 23.80(4), at p. 23–1551.

Miriam Wolf directs the Court's attention to Norman v. McKee, 290 F. Supp. 29 (N.D. California, 1968) where the proposed settlement was found "so inadequate and, therefore, so unfair" that Court approval was denied. The Court found that "the proposed settlement of this suit * * * does not confer any significant benefit on the Fund [nominal defendant in the derivative suit], its present investors or those who were investors at the time of the alleged violations. * * *." (at p. 33). This is decidedly not our case. The proposed settlement here calls for the return of major assets to Curtis as well as substantial cash payments.

Cohen v. Young, 127 F.2d 721 (CCA 6, 1942), also cited by objector, is likewise readily distinguishable from the matter before me. In Cohen v. Young, "the (trial) court recognized that appellant [objector] was *ready to proceed with evidence in support of his objection*, but approved the compromise upon the sole ground that it was recommended by the attorneys of record." (at p. 724, emphasis added.) Here we have a statement of objection in very general terms. The objector is *not* ready to proceed with evidence in support of his objection, as was true in Cohen v. Young; rather, thirty days of new discovery is sought to gather evidentiary data to support the general allegations. Moreover as I determine whether to approve the proposed settlement I have before me far more than the recommendations of the attorneys of record. The one year course of litigation has produced in the form of pleadings, conferences, and hearings a rather complete picture of the matters at issue and how they are sought to be compromised.

In their Memorandum of Law in Support of Objections, counsel for Miriam Wolf cite two Delaware Court of Chancery decisions where pre-settlement discovery was allowed. Both Manacher v. Reynolds, 39 Del.Ch. 401, 165 A.2d 741 (1960) and Dann v. Chrysler Corp., 41 Del.Ch. 438, 198 A.2d 185 (1963), are opinions by Judge Seitz of the United States Court of Appeals for the Third Circuit written when he was Chancellor of the Delaware Court of Chancery. In both cases the proposed settlements were approved. Objector does not direct my attention to any facts surrounding the Chancellor's granting of pre-settlement discovery. I therefore have no way of determining if the parties who were granted the right to take discovery had acted with anything like the same lack of diligence seen here.

Chancellor Seitz' opinion in *Manacher* teaches that "in weighing the fairness of the settlement * * * I need not

decide the merits of the lawsuit being settled." There as here "the court is in a particularly good position to evaluate the merits * * *. I say this because, at the time the settlement was proposed, the case was awaiting decision after discovery, briefing and argument on defendants' motions to dismiss or for summary judgment." (165 A.2d at p. 749). Chancellor Seitz also noted "overwhelming stockholder approval" of the settlement, and I am not unmindful that thousands of shareholders have not come forward to object to the proposed settlement here.

■ Having presided over the course of the litigation for one year, I am fully satisfied that the proposed compromise settlement is the product of diligent arms-length negotiations. I find that the settlement is, on its face, fair and deserving of judicial approval and nothing has appeared of record to show that it is in any way less than equitable.

Our judicial system contributes to the administration of justice no less by promoting the fair settlement of disputes and an end to litigation than by forcing parties to trial and the prolongation of the state of adversity. There comes a time when controversies must be put to rest and litigation definitively concluded. Because I find the proposed settlement, taken as a whole, to be fair on its face, this is such a time.

### ORDER

And now, this 26th day of February, 1970, it is hereby ordered that:

(1) The agreement of November 26, 1969—subject matter of the January 21, 1970 hearing—is approved.

(2) The objections of Mrs. Miriam Wolf are overruled and dismissed.

(3) The request of Mrs. Miriam Wolf for additional time in which to conduct discovery is denied.

It is so ordered.