See also, 3 Cir., 438 F.2d 103.

Gervase J. PURCELL, Jr., et al.

v.

Frank KEANE et al.

Civ. A. No. 41497.

United States District Court,
E. D. Pennsylvania.

Feb. 16, 1972.

Stanley E. Gever, Edward B. Bergman, Philadelphia, Pa., for plaintiffs.

Saul Doner, Francis Patrick Cosgrove, Paul J. Donnelly, Philadelphia, Pa., for defendants.

## OPINION AND ORDER

MASTERSON, District Judge.

This case began over five years ago when the plaintiffs filed this class action under Rule 23 on behalf of all members of Local 169, Warehouse Employees Union, International Brotherhood of Teamsters. The complaint charges the defendants, who are present or former officers of the Local[1] with numerous violations of certain fiduciary duties imposed upon them by the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 501.[2]

In a nutshell, it is alleged that the defendants improperly spent union funds on food, drinks, travel and entertainment for their own personal benefit. And Section 501 of the Act clearly forbids such expenditures since they do not directly benefit the labor organization. See, e. g., Morrissey v. Curran, 423 F.2d 393 (2nd Cir. 1970). To support their assertions, plaintiffs have introduced 283 cancelled checks as exhibits and filed thousands of pages of depositions. By way of relief, plaintiffs seek (1) an accounting; (2) restitution of all improperly spent funds; and (3) such other relief as this Court deems appropriate.

On the other hand, the defendants steadfastly deny any wrongdoing. They assert that each of the plaintiffs' exhibits represents a proper expenditure for union purposes. In addition, they urge that the plaintiffs have initiated an unfounded political suit in an effort to embarrass the defendants and thereby unseat them as union officers.

Presently, there are three settlement proposals before this Court. The first,

---

1. The defendants held the following offices when suit was instituted Frank Keane, Executive Vice President and Business Agent; Archie McGown, Secretary-Treasurer and Business Agent; Frank Burdy, Recording Secretary and Business Agent; Bernard Marcus, Business Agent; Andrew O'Hara, Organizer and Trustee; William Maloney, Trustee and Business Agent.

2. The statute reads in part as follows:
"(a) The officers, agents, shop stewards, and other representatives of a labor organization occupy positions of trust in relation to such organization and its members as a group. It is, therefore, the duty of each such person, taking into account the special problems and functions of a labor organization, to hold its money and property solely for the benefit of the organization and its members and to manage, invest, and expend the same in accordance with its constitution and by laws and any resolutions of the governing bodies adopted thereunder, . . . A general exculpatory provision in the constitution and bylaws of such a labor organization or a general exculpatory resolution of a governing body purporting to relieve any such person of liability for breach of the duties declared by this section shall be void as against public policy (b) When any officer, agent, shop steward, or representative of any labor organization is alleged to have violated the duties declared in subsection (a) of this section and the labor organization or its governing board or officers refuse or fail to sue or recover damages or secure an accounting or other appropriate relief within a reasonable time after being requested to do so by any member of the labor organization, such member may sue such officer, agent, shop steward, or representative in any district court of the United States or in any State court of competent jurisdiction to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization."

submitted by counsel for Gregory Horan, one of the plaintiffs, and agreed to by all of the defendants provides for stricter methods of control and accounting which would help insure against any impropriety in the future. However, this proposal does not include any provision for restitution to the union treasury. The second agreement, also proferred by plaintiff Horan and all of the defendants contains provisions similar to those in the first with one important difference. This agreement calls for $3,000 restitution by the defendants. The third proposal, submitted by four of the named plaintiffs, all of whom object to the first two agreements, calls for restitution in an unspecified amount and an admission of wrongdoing by the defendants as well as a requirement that the defendants publish detailed quarterly reports of union expenditures. However, since *none* of the defendants has agreed to the third proposal, it is not properly before this court for consideration.

After long and careful reflection, it is the judgment of this court that the second settlement agreement should be accepted over the objections of four of the named plaintiffs.[3] To fully appreciate why the second proposal is both fair and reasonable to the entire class, one must first understand the chronology of this litigation as well as the nature of the plaintiffs' objections to the settlement.

## I.

From the beginning of this suit on November 8, 1966 until May 22, 1970, all of the named plaintiffs were represented by Edward B. Bergman, Esq., a distinguished and experienced labor lawyer. Unfortunately, during those 3½ years, the parties made little effort to prepare for trial.[4]

On three occasions, February 13, 1968, June 12 and August 29, 1969, plaintiffs filed notices of depositions of the defendants. But each time, with two exceptions, defendants failed to appear for the depositions; instead they petitioned for protective orders prohibiting such actions.[5] In response, the plaintiffs also filed a protective order which this court signed on August 29, 1969.[6] Despite these three attempts and the Court's order, the depositions of only two of the defendants were taken. Moreover, according to the docket, the defendants did not even attempt to take any depositions of the plaintiffs.

Although very little discovery took place during the first 3½ years of litigation, Mr. Bergman's efforts ultimately produced the first settlement agreement

---

3. At a hearing on the fairness of the proposed settlement agreements, three members of the class who were not named plaintiffs also voiced objections to the first two agreements.

   Although the third proposal is not properly before us, nevertheless, even if we were to consider it, our judgment to accept the second agreement would not be altered.

4. In this time period, the case went up to the Court of Appeals twice; once in an appeal from an order denying the defendants' motions to dismiss (Decision reported at 277 F.Supp. 252 (E.D.Pa.1966), the other from an order dismissing defendants' counterclaim. In both cases, the Court of Appeals affirmed the orders of the District Court (The opinion in the first appeal is reported at 406 F.2d 1195 (3rd Cir. 1969). The other opin-

ion is reported at 430 F.2d 1182 (3rd Cir. 1970).

5. On July 1, 1969, Archie McGowan's deposition was taken. However, it appears that McGowan, who at all times was represented by his own counsel, had fundamental disagreements with the other five defendants. In fact, he has recently been excluded from membership in Local 169. (Deposition of Archie McGowan at 3–5).

6. That order forbid Bernard N. Katz, Esq., counsel for Local 169 from participating in the taking of depositions and required the defendants to testify even though interested spectators were present. Local 169 appealed to the Court of Appeals which for the third time affirmed the order of this court. (Decision unreported).

which we outlined above. For several reasons, Mr. Bergman thought that this proposal represented a good settlement and recommended its acceptance to his clients. First, and perhaps most importantly, he felt that the agreement would prevent a re-occurrence of the types of alleged expenditures which originally led to his clients' complaint. Secondly, since the Union's election had been held in 1968, any political benefit which might be gained from the suit had already been accomplished. And finally, he concluded that the expense of proceeding to trial could not be justified in terms of the potential monetary recovery.[7]

But Mr. Bergman was able to convince only two of the named plaintiffs that they ought to go along with this settlement.[8] The other four plaintiffs stated they would accept nothing less than an admission of guilt from the defendants. As a result of this serious difference in strategy, the non-assenting plaintiffs lost confidence in Mr. Bergman. Subsequently, he petitioned this court for permission to withdraw as their attorney. On May 22, 1970, we granted that petition.

Several weeks later, James A. Burgess, Jr., Esq. entered an appearance on behalf of the four dissatisfied plaintiffs. On September 9, 1970, plaintiffs' new attorney filed a fourth notice of Frank Keane's deposition. Once again, however, instead of appearing, the defendant requested another protective order.

Shortly thereafter, five of the six defendants moved to switch counsel. We also granted their petition, and on December 8th, 1970, their new attorney at last filed notice that he intended to take depositions of some of the plaintiffs. But these depositions were not actually taken until more than one year later.

Because of the extreme lack of diligence on the part of counsel, this court filed an order requiring that all discovery be completed by March 2, 1971. But counsel could not agree on relatively routine matters such as sequestration of witnesses, and the order for the taking of depositions. Moreover, counsel constantly advised the various deponents not to answer certain questions and this caused needless delays. It took many conferences and two additional orders from this court to get discovery moving again, or so we thought.

On February 24, 1971, plaintiffs filed the fifth notice of the taking of defendant Keane's deposition. Still no deposition was taken. Next, on March 8, 1971, six days *after* we had ordered all discovery to be completed, plaintiffs moved for an extension of time in which to take the remaining defendants' depositions. Although this motion clearly violated our prior order, in order to afford every element of fairness to the plaintiffs, we granted an extension of 60 days. In the interim between February 24, 1971 and our order, depositions of three plaintiffs were taken and filed.

Just 17 days before our first extension for completing discovery was to expire, plaintiffs sought permission to switch lawyers again. Due to a conflict of interest, the Philadelphia Bar Association advised Mr. Burgess that he should not represent the class of union members. Consequently, on September 9, 1971, plaintiffs' *third* attorney, Stanley E. Gever, Esq. entered the case. Although very experienced and able, because of his lack of familiarity with the case (including one hundred or so docket entries and the thousands of pages of depositions), Gever requested a second extension of time in which to prepare for and complete the remaining depositions of the defendants. Once again, this Court ac-

---

7. N.T. 47–50 (Hearing on December 6, 1971).

8. Plaintiffs, James J. Higgins and Gregory Horan, agreed to accept the settlement proposal. Subsequently, Higgins withdrew as a named plaintiff, leaving Horan as the sole proponent on behalf of the class.

commodated the plaintiffs and extended the final date to October 15, 1971. Then, for the sixth time, plaintiffs filed notice of the taking of Frank Keane's deposition on September 22, 1971. That deposition was finally taken in mid-October, 1971, and discovery finally closed on the ordered date.

In late October and early November, 1971, Mr. Gever commenced serious settlement discussions with counsel for the defendants. This court also conducted many settlement conferences. After many hours of tedious negotiation among the parties, a second settlement agreement was carefully molded. As mentioned above, this proposal won for the plaintiffs the added concession of $3,000 in restitution to the union treasury. At this point, Mr. Gever felt he had achieved the goals of his clients, and indicated that he would recommend acceptance of the proposal.

Once again, however, the plaintiffs refused to accept the new agreement because it lacked language expressly stating that the defendants had violated their fiduciary duties. Because of the plaintiffs' refusal to follow his advice and a loss of confidence between clients and attorney, Mr. Gever became the plaintiffs' third attorney to seek permission to withdraw from this case. Moreover, the plaintiffs have again asked this court for an extension of time before the trial, if any, in order that they might secure the services of yet a *fourth* lawyer.

When these plaintiffs refused to adopt the second agreement, Mr. Bergman indicated that he would recommend its acceptance to his one remaining client, in order to preserve this proposal before the Court. Needless to say, Mr. Gever expressed disappointment that the proposal which he negotiated had to be rescued by Mr. Bergman and his client.

## II.

The seven members of Local 169 who appeared at the final hearing to oppose the two settlement proposals belong to or sympathize with an organization called T.U.R.F., Teamsters Union Rank and File. This is a group of "rebels" with admirable goals; to increase both the flow of information and the practice of democracy in Teamsters Unions throughout the Country. Although we were particularly impressed with plaintiffs' sincerity and dedication; nevertheless we feel that *this* suit is an inappropriate vehicle for advancing some of their specific grievances with the officers of Local 169.

Plaintiffs concede that their primary concern, even in this litigation, centers around the fairness of the elections that have been held in recent years.[9] Plaintiffs seek to insure fair elections by ousting the defendants whom they claim are perpetuating the alleged improprieties. And they seek to effectuate the ouster by proving to the general membership that their officers have violated their fiduciary duties imposed by Section 501. But even if a jury eventually found that the defendants had violated their fiduciary duties, such a finding would not necessarily guarantee fairer elections. Moreover, to cure this alleged problem, the plaintiffs have misconceived their remedy. Rather than suing under Section 501, Subchapter 5, §§ 481–483 of the Act expressly establishes a process of appeal to the Secretary of Labor in unfair election cases with review in the federal courts.

In addition to the alleged unfairness of election procedures, plaintiffs also complain that the officers have not adequately or effectively represented the members in certain labor disputes with management.[10] Once again, however, plaintiffs have misconceived their remedy. In Vaca v. Sipes, 386 U.S. 171, 87

---

9. N. T. 17–21, 41–42 (Hearing on December 6, 1971).

10. *Ibid.* at 42–45.

S.Ct. 903, 17 L.Ed.2d 842 (1967), the Supreme Court held that union members so aggrieved can sue their officers under 29 U.S.C. § 185.[11]

In all fairness, we must point out that the plaintiffs also express serious concern about alleged mismanagement and misappropriation of union funds which forms the basis of this suit. Moreover, they scorn the accounting procedures and lack of financial reporting within the union. It is these issues to which we must address ourselves in assessing the fairness of the settlement, and not the indirect impact the settlement might have on other union problems. In short, our foremost consideration is not who manages Local 169, but rather whether it is being managed properly within the guidelines of Section 501.

### III.

■ Rule 23(e), Fed.R.Civ.Proc. provides that no class action shall be dismissed or compromised without Court approval. In a very real sense, this rule places the Court in the position of a guardian for those members of the class who have not appeared as well as for the union membership as a whole. Cf. Norman v. McKee, 290 F.Supp. 29 (N.D.Cal. 1968) (Sweigert J), aff'd 431 F.2d 769 (9th Cir. 1970). Although the Court should not substitute its own judgment on the precise terms of the settlement for that of the parties, nevertheless, the court should not approve the settlement if it "appears on its face to be so inadequate, and therefore, so unfair to the . . . represented class as not to merit judicial approval." 290 F.Supp. at 32.

■ In determining the fairness of the proposed settlement the court must balance "the likelihood of plaintiffs' vic-tory on a trial . . . as against the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures." Glicken v. Bradford, 35 F.R.D. 144, 152 (S.D.N.Y. 1964).[12] Finally, it is settled law that the burden rests with the proponents of the settlement to convince the court that it is fair. See Norman v. McKee, supra. With these legal principles in mind, we turn to the second settlement agreement which we have decided to approve.

First, the settlement agreement provides that elaborate audit procedures will be established to guard against any impropriety in the future. Those procedures are in substance as follows:

"No expense reimbursement funds will be paid to any official, steward or representative of the union without a voucher being signed by the person incurring the expenses. The voucher must state the date, names of the people involved, and the reason for the union related expense. It must be approved by both the President and Secretary Treasurer before payment.

On the use of credit cards where they are the type of credit cards that have vouchers attached to the billing, the same information as above must be affixed before any approval for payment of the credit card charge may be made. Where vouchers are not attached and the credit billing is a single sheet, person(s) incurring the expense must identify each dated expenditure with the same information as is required for direct cash reimbursement. Here, too, no payments will be made to the billing company until this information is supplied and the President and Secretary Treasurer approve payment.

---

11. See Falsetti v. Local Union, No. 2026, United Mine Workers, 355 F.2d 658 (3rd Cir. 1966).

12. Protective Committee, etc. v. Anderson, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) ; Philadelphia Housing Authority v. American R. & S. San. Corp., 322 F.Supp. 834, 840 (E.D.Pa.1971), affd. 453 F.2d 30 (3rd Cir. 1971) (Nos. 71–1383–4–5) ; Bok v. Ackerman, 309 F.Supp. 710 (E.D.Pa.1970).

Each month the Secretary Treasurer [will submit] a full financial report for membership consideration and for membership vote. The financial report must either be approved or disapproved. If it is the latter, then the questions causing the disapproval are taken up and appropriate action follows.'

In addition, there is a union newspaper which is published at regular intervals, a copy of which is in the possession of the Court. The last page of the paper sets forth the financial report for the month preceding the month in which the paper goes to print."

Hence it is reasonably certain that allegations similar to those made in this case should not arise again in Local 169.

Secondly, by terms of the agreement the union treasury will receive $3,000 in restitution from the defendants. Although this sum may seem small, it constitutes a full one-third of the admitted outside limit of recovery.[13] Without actually deciding the factual issues involved, our independent study of the depositions and exhibits convinces us that this represents a fair settlement figure. Indeed, we reject the first settlement proposal precisely because it lacks any provision for restitution. In our opinion, any agreement without some restitution is unfair on its face.

Thirdly, it is apparent to us that the cost of a trial to all parties would be prohibitive in terms of what each side might gain. From our knowledge of the litigation, an estimate of three weeks for trial constitutes a fairly conservative guess. Since the objecting plaintiffs concede that the outside limit of recovery is $9,000, even they should realize that three weeks is entirely too much time for five lawyers and this court to spend litigating a matter involving $6,000 (the net figure between the outside limit and the settlement figure). Moreover, because plaintiffs' attorneys fees may be paid out of the Union's treasury, the financial result to the union even in the event of success might well be a net loss. Finally, we foresee more delays from further litigation since the defendants would undoubtedly take an appeal if they lost.

Against these factors we must balance the likelihood of plaintiffs' victory as well as the increment of gain (if any) over the terms of the settlement that such a victory might bring. Although the accounting practices in Local 169 prior to this suit were very sloppy and inadequate and many vouchers are missing, it does not follow from these facts that the defendants are guilty of any misappropriation of funds. Indeed, only a jury or other trier of fact could decide whether the missing vouchers (and missing signatures of approval on those that do exist) represent instances of misuse of union funds. The defendants claim that individuals who sympathize with the plaintiffs stole these missing vouchers. On the other hand, plaintiffs contend that the defendants destroyed them to hide their misfeasance. In this connection, one additional fact is worth mentioning.

In 1965, the federal government indicted the President of Local 169, Edward Hartsough (who curiously is not a defendant in this suit) under 29 U.S.C. 501(c), a companion criminal provision to the section which gives rise to the court's jurisdiction in this case. Later that year, a jury found him guilty of stealing union funds. This episode is relevant because during this one year period, the federal government had all of the Union's financial records in its possession. And despite Mr. Bergman's pleas, the government refused to proceed against any officer other than Hartsough.

Aside from the question of missing vouchers, on the issue of convention ex-

---

13. Plaintiffs concede that $9,000 is the ultimate possible recovery. *Ibid.* at 10.

penses, the plaintiffs seem to have a somewhat greater probability of success. It is not disputed that (1) the defendants received a $1500 expense allowance to attend the 1966 Convention of the International Brotherhood of Teamsters held in Miami; (2) the Local's membership approved the expenditures; (3) the defendants did not spend more than $800 or $900 each at the Convention; and (4) each defendant with one possible exception kept the balance of his allowance and put it to his own personal use.[14] Even though the membership approved these expenditures, nevertheless, they are questionable since such a resolution might violate public policy under Section 501(a) of the Act. In any event, this constitutes a difficult legal question upon which we express no opinion.

Lastly, we will comment briefly upon certain insurance policies which the Executive Board voted to take out upon the lives of union officers. The Board allowed each insured to name the beneficiary of the policy, even though the premiums were paid with union funds. Moreover, after a relatively short period of time the Board voted to suspend payment of premiums and awarded the cash surrender values to the officers themselves.[15] Once again, it is difficult to assess the legal consequences of these actions under Section 501.

Assuming *arguendo* that the plaintiffs won on any or all of the broad issues outlined above, in our judgment they would not achieve better control and accounting policies than those already contained in the second agreement, nor would their success benefit the union treasury. Success would only brand the defendants "guilty" of violation of their fiduciary duties.

Although such a result may well constitute an important or even crucial factor for judicial consideration in examining the fairness of a settlement proposal where clear or overwhelming evidence of serious misconduct exists, this is not such a case.[16] For this reason (although we have taken it into consideration), we hold that *in this case* the absence of an admission of wrongdoing is not such a contaminating omission that the second agreement becomes "so inadequate, and therefore so unfair to the . . . represented class as not to merit judicial approval."

On the contrary, after presiding over this extraordinarily protracted case for over 2½ years, having read all the depositions, examined all the exhibits and considered all of the briefs, this Court is convinced that the second settlement agreement is fair and equitable to the class. And although we have carefully considered the plaintiffs' objections, our conclusion remains unchanged. We concur with Judge Higginbotham's thoughtful comment in approving settlement of a class action in Bok v. Ackerman, supra:

> "Our judicial system contributes to the administration of justice no less by promoting the fair settlement of disputes and an end to litigation than by forcing parties to trial and the prolongation of the state of adversity. There comes a time when controversies must be put to rest and litigation definitively concluded." 309 F. Supp. at 716.

For Purcell v. Keane, the controversy ends today.

---

14. Defendant Archie McGowan claims that he used the excess to offset other legitimate union expenditures. Deposition of Archie McGowan at 49.

15. In the alternative, the officers could retain the policies and assume the burden of paying the premiums. The policies were all worth several hundred dollars each when turned over to the defendants.

16. Compare Moschetta v. Cross, 241 F. Supp. 347, (D.C.D.C.1964), aff'd. sub nom., Ratner v. Bakery Workers Union, 354 F.2d 504 (D.C.Cir. 1965).